**2013-1087**
**(Reexamination Nos. 95/001,108 & 95/001,154)**

# United States Court of Appeals
# for the Federal Circuit

RAMBUS, INC.,

*Appellant,*

*v.*

MICRON TECHNOLOGY, INC.,

*Appellee.*

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board.*

## BRIEF FOR APPELLEE
## MICRON TECHNOLOGY, INC.

Henry A. Petri, Jr.
James P. Murphy
Michael W. O'Neill
Margaux A. Aviguetero
Daniel P. Mullarkey
NOVAK DRUCE CONNOLLY BOVE +
    QUIGG LLP
1875 Eye Street, NW
Eleventh Floor
Washington, DC 20006
(202) 331-7111

*Attorneys for Appellee*
Micron Technology, Inc.

JUNE 14, 2013

# <u>CERTIFICATE OF INTEREST</u>

Counsel for appellee Micron Technology, Inc. certifies the following:

1.      The full name of every party or amicus represented by me is:

      <u>Micron Technology, Inc.</u>

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      <u>Micron Technology, Inc.</u>

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      None

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Henry A. Petri., Jr., James P. Murphy, Michael W. O'Neill, Margaux A. Aviguetero, Daniel P. Mullarkey, Gregory V. Novak, Tracy W. Druce, Donald J. Quigg
    NOVAK DRUCE CONNOLLY BOVE + QUIGG, LLP (Formerly Novak Druce + Quigg LLP)

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ......................................................................v

TABLE OF ABBREVIATIONS ............................................................ viii

STATEMENT OF RELATED CASES ........................................................x

I.    STATEMENT OF THE ISSUES ....................................................1

II.   STATEMENT OF THE CASE ........................................................2

III.  STATEMENT OF FACT ................................................................3

    A.    Introduction .........................................................................3

    B.    Claim 34 ..............................................................................3

    C.    The Prior Art .......................................................................4

           1.    Bennett .......................................................................4

           2.    Wicklund....................................................................9

           3.    Bowater....................................................................10

           4.    JEDEC......................................................................11

           5.    Park .........................................................................12

    D.    Background of the Technology at Issue...............................12

           1.    Dynamic Random Access Memory ..........................12

           2.    Prior Cases Involving Synchronous "Memory Devices" .........16

           3.    Precharging of Sense Amplifiers .............................17

           4.    Alleged Objective Evidence of Non-Obviousness ...................19

E.    Summary of the Proceeding Prior to this Appeal .............................21

    1.    Rejection Based on Bennett In View of Wicklund or Bowater .................................................................................21

    2.    Response to Rambus's Arguments Made in its "Statement of Facts" Regarding Micron's Appeal to the Board ..................................................................................25

    3.    Rejections Based on JEDEC and Park....................................26

    4.    The Board's Decision ..............................................................27

IV.    SUMMARY OF THE ARGUMENT ........................................................31

V.    ARGUMENT..............................................................................................32

A.    Standard of Review .........................................................................32

B.    The Examiner's Findings Do Not Undercut the Board's Determination of Obviousness.................................................33

C.    The Board May Rely On Its Scientific Knowledge In *Inter Partes* Reexamination Proceedings................................................38

D.    The Board's Factual Findings Underlying Its Obviousness Determination Are Supported by Substantial Evidence ....................40

    1.    An Operation Code Containing Both a Write Instruction and an Automatic Precharge Instruction...................................40

    2.    Automatic Precharge................................................................45

    3.    Synchronous Dynamic Random Access Memory Device........47

    4.    Delay Time................................................................................52

E.    Alternatively, the Board Erred in Not Adopting the Rejections Based on JEDEC and Park ................................................................53

    1.    The Board Relied on an Improper Legal Standard for Priority Written Description .......................................................55

2.      The Proper Legal Standard for Determining Priority
        Written Description ................................................................56

3.      The Memory Device "Invention" Disclosed in the '037
        Patent Requires an Interface to a Narrow Multiplexed
        Bus ..........................................................................................58

4.      The "Prior Art" to the '037 Patent Was Distinguished
        Based on the Bus and Interface Structure ...............................61

VI. CONCLUSION ................................................................................63

CERTIFICATE OF SERVICE ...............................................................64

CERTIFICATE OF COMPLIANCE .......................................................66

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
　560 F.3d 1366 (Fed. Cir. 2009) ....................................................56

*Brand v. Miller*,
　487 F.3d 862 (Fed. Cir. 2007) .....................................................39

*Consol. Edison Co. v. NLRB*,
　305 U.S. 197 (1938)............................................................ 33, 45

*Consolo v. Federal Maritime Comm'n*,
　383 U.S. 607 (1966)..................................................................34

*Ex parte Frye*,
　94 USPQ2d 1072 (BPAI 2010) ............................................ 34, 35

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
　535 U.S. 722 (2002)...................................................................56

*Finisar Corp. v. DirecTV Group, Inc.*,
　523 F.3d 1323 (Fed. Cir. 2008) ....................................................21

*Hoover Co. v. Royal Appliance Mfg. Co.*,
　238 F.3d 1357 (Fed. Cir. 2001) ...................................................32

*Hynix Semiconductor Inc. v. Rambus Inc.*,
　645 F.3d 1336 (Fed. Cir. 2011) .......................................... *passim*

*ICU Medical, Inc. v. Alaris Medical Systems, Inc.*,
　558 F.3d 1368 (Fed. Cir. 2009) ...................................... 54, 55, 57

*In re Berg*,
　320 F.3d 1310 (Fed. Cir. 2003) ...................................... 35, 38, 39

*In re Constr. Equip. Co.*,
　665 F.3d 1254 (Fed. Cir. 2011) ...................................................33

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) .................................................. 33

*In re Hyatt*,
211 F.3d 1367 (Fed. Cir. 2000) .................................................. 33

*In re Hyon*,
679 F.3d 1363 (Fed. Cir. 2012) .................................................. 33

*In re Jolley*,
308 F.3d 1317 (Fed. Cir. 2002) ...................................... 31, 34, 47

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006) ................................................... 41

*In re Keller*, 642 F.2d 413 (CCPA 1981) ................................. 14

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000) .................................................. 33

*In re Lovin*,
652 F.3d 1349 (Fed. Cir. 2011) .................................................. 52

*In re Merck & Co. Inc.*,
800 F.2d 1091 (Fed. Cir. 1986) ...................................... 32, 40, 48

*In re Mettke*,
570 F.3d 1356 (Fed. Cir. 2009) .................................................. 21

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011) .................................................. 33

*In re Oetiker*,
977 F.2d 1443 (Fed. Cir. 1992) .................................................. 35

*In re Rambus Inc.*,
694 F.3d 42 (Fed. Cir. 2012) .................................... 13, 16, 47, 51

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) ........................................... 13, 31

*In re Zurko*,
258 F.3d 1379 (Fed. Cir. 2001) .................................................. 39

vi

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)................................................................. *passim*

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005) ...................................... 57, 58, 61

*Muniauction, Inc. v. Thomson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008) ................................................19

*Para-Ordnance Mfg. v. SGS Importers Int'l, Inc.*,
    73 F.3d 1085 (Fed. Cir. 1995) ..................................................33

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................21

*Rambus Inc. v. Infineon Technologies AG*,
    318 F.3d 1081 (Fed. Cir. 2003) ...................................... 31, 54, 55

*Superglide Corp. v. DirecTV Enterprises, Inc.*,
    358 F.3d 870 (Fed. Cir. 2004) ..................................................26

*Tronzo v. Biomet, Inc.,*
    156 F.3d 1154 (Fed. Cir. 1998) .......................................... 56, 58

## Statutes and Regulations

35 U.S.C. § 6(a) ............................................................... 38, 39

35 U.S.C. § 6(b) (2002) .........................................................34

35 U.S.C. § 6(b) (P.L. 112-283, Sept. 16, 2012, approved 1-15-13) .....................34

35 U.S.C. § 112 ....................................................................56

35 U.S.C. § 120 ....................................................................56

37 C.F.R. § 41.77(a).............................................................35

37 C.F.R. § 41.77(b) ............................................................36

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| '037 Patent | Rambus's U.S. Patent No. 6,584,037 |
| '898 application | Application No. 07/510,898, the original parent application to which the '037 Patent claims priority |
| ACP | Action Closing Prosecution |
| Bennett | U.S. Patent No. 4,734,909, cited by the Board |
| Board | Board of Patent Appeals and Interferences (now, Patent Trial and Appeal Board) |
| Bowater | U.S. Patent No. 5,301,278, cited by the Board |
| DRAM | Dynamic Random Access Memory |
| JEDEC | Joint Electron Device Engineering Council (JEDEC) Standard No. 21-C, Revision 9, published 1999, cited by Micron in its reexamination request |
| Micron | Micron Technology, Inc., Third Party Requester |
| Park | U.S. Patent No. 5,590,086, cited by Micron in its reexamination request |
| PTO | United States Patent and Trademark Office |
| Rambus | Rambus, Inc., Patent Owner of the '037 Patent |
| RAN | Right of Appeal Notice |
| Samsung | Samsung Electronics Co., Ltd., Third Party Requester |
| VBI | Versatile Bus Interface |
| VLSIC | Very large scale integrated circuit |
| Wicklund | U.S. Patent No. 5,159,676, cited by the Board |
| A__ | Page in Joint Appendix |

A__(xx:yy-zz)      Joint Appendix page where xx represents a column number of a patent, yy represents the initial line of cited text, and zz represents the ending line of cited text

**NOTE:**  All emphases in this brief have been added unless otherwise noted.

## STATEMENT OF RELATED CASES

Appellee Micron filed a cross-appeal from this reexamination, assigned appeal number 2013-1088. The cross-appeal was dismissed on December 21, 2012. Micron is unaware of any other appeals or petitions taken in this reexamination proceeding, however, there are a number of different matters pending in this Court and other courts that involve the '037 Patent.

1. The following pending cases involve the '037 Patent.

   a. *Rambus, Inc. v. Hynix Semiconductor Inc.*, No. 5:05-cv-00334-RMW (N.D. Cal.) (Whyte, J.).

   b. *Rambus, Inc. v. LSI Corp.*, No. 3:10-cv-05446-RS (N.D. Cal.) (Seeborg, J.).

   c. *Rambus, Inc. v. Micron Technology, Inc.*, No. 5:06-cv-00244-RMW (N.D. Cal.) (Whyte, J.).

   d. *Rambus, Inc. v. STMicroElectronics, N.V.*, No. 3:10-cv-05449-RS (N.D. Cal.) (Seeborg, J.).

2. The following pending cases do not involve the '037 Patent but involve patents that, like the '037 Patent, descend from the '898 application.

   a. *Rambus, Inc. v. Micron Technology, Inc.*, No. 2013-1192 (Fed. Cir.). This case is currently pending before the Federal Circuit.

   b. *Rambus, Inc. v. Micron Technology, Inc.*, No. 2013-1224 (Fed. Cir.). This case is currently pending before the Federal Circuit.

   c. *Rambus, Inc. v. Micron Technology, Inc.*, No. 2013-1228 (Fed. Cir.). This case is currently pending before the Federal Circuit.

   d. *Rambus, Inc. v. Micron Technology, Inc.*, No. 2013-1339 (Fed. Cir.). This case is currently pending before the Federal Circuit.

e. *Hynix Semiconductor, Inc. v. Rambus, Inc.*, No. 5:00-cv-20905-RMW (N.D. Cal.) (Whyte, J.). This case is on remand from Appeal Nos. 2009-1299, -1347, 645 F.3d 1336 (Fed. Cir. 2011).

f. *Micron Technology, Inc. v. Rambus, Inc.*, No. 1:00-cv-00792-SLR (D. Del.) (Robinson, J.). This case was remanded from Appeal No. 2009-1263, 645 F.3d 1311 (Fed. Cir. 2011). Currently, Rambus filed a Notice of Appeal and appeals to the Federal Circuit from the judgment of the district court entered on February 25, 2013.

g. *In re Rambus Inc.*, No. 2011-1247, 694 F.3d 42 (Fed. Cir. 2012).

h. *Rambus, Inc. v. Kappos*, No. 2012-1634 (Fed. Cir.) (briefing not yet complete).

## I.    STATEMENT OF THE ISSUES

1.    Whether substantial evidence supports the Board's conclusion that claim 34 is rendered obvious over Bennett in view of either Wicklund or Bowater where the Board determined that a read/write instruction and a precharge instruction were intimately coupled together in the prior art systems, thus rendering obvious the use of an operation code that includes both a write instruction and an automatic precharge instruction.

2.    Whether substantial evidence supports the Board's conclusion that claim 34 is rendered obvious over Bennett in view of either Wicklund or Bowater where the Board determined that Bennett discloses a synchronous memory device on a single chip and DRAMs were a well-known, if not dominant, form of a memory used for memory devices at the time of the invention, thus rendering obvious the limitation "synchronous dynamic random access memory device" recited in the claim 34 preamble.

3.    Alternatively, whether the Board erred in determining claim 34 had priority to the '898 application, rendering JEDEC and Park unavailable as prior art, where the '898 application plainly describes the memory invention as a multiplexed bus interface, and claim 34 therefore has no written description support in the '898 application because it does not expressly claim such an interface.

1

## II.  STATEMENT OF THE CASE

In this case, Micron and Samsung each submitted a request for *inter partes* reexamination of claim 34 of the '037 Patent. The PTO subsequently merged the two proceedings into a single proceeding on July 21, 2009.

In the Office Action of August 7, 2009, the examiner initially rejected claim 34 based on Bennett in view of Wicklund or Bowater. Subsequently, the Examiner withdrew the rejections over the cited prior art. Micron then appealed the examiner's allowance of claim 34 to the Board.

In its Decision, the Board determined that the examiner erred in withdrawing the rejection of claim 34 of the '037 Patent and held that claim 34 was rendered obvious by Bennett in view of Wicklund or Bowater. The Board concluded that Bennett in view of Wicklund or Bowater renders obvious using a synchronous DRAM with a single operation code that specifies both precharge and write functions. (A29-30.) In reaching this conclusion, the Board relied on the evidence of record, such as the teachings in the cited prior art, that demonstrated claim 34 was obvious. Rambus filed a Request for Rehearing, which the Board considered and denied.

Rambus now appeals the Board's decision that claim 34 of the '037 Patent would have been obvious over Bennett in view of Wicklund or Bowater.

## III.    STATEMENT OF THE FACTS

### A. Introduction

Rambus alleges it is "uncontested that, in the twenty years before 1990, no one had conceived of a synchronous DRAM" that incorporates features recited in claim 34. (Rambus's Br. 3-4.) Micron does not acquiesce in that statement, given the strong case of obviousness Micron has demonstrated and the Board has found.

### B. Claim 34

Claim 34, with pertinent limitations emphasized, recites:

34. A method of operation of *a synchronous dynamic random access memory device*, wherein the method comprises:

sampling *an operation code* synchronously with respect to an external clock signal, wherein the operation code specifies that the memory device sample data to be written into a plurality of dynamic memory cells, and

*wherein the operation code further specifies that the memory device precharge a plurality of sense amplifiers*;

sampling the data, in response to the operation code, after a delay time transpires;

sampling address information to identify a subset of the plurality of dynamic memory cells;

writing the data to the subset of the plurality of dynamic memory cells using the plurality of sense amplifiers; and

*precharging the plurality of sense amplifiers in response to the operation code, wherein the plurality of sense amplifiers is precharged automatically after the data is written*.

(A92(27:64-28:20).)

3

### C. The Prior Art

#### 1. Bennett

Bennett describes a highly versatile interconnection scheme to provide high performance, economical resources, and flexible configuration that was designed to become the standard interface for a "myriad [of] devices." (A1305(12:14-25).) This is consistent with the statement of Rambus's expert, Mr. Murphy. (A1625[¶91]("Bennett is a nearly 400-page reference that is primarily directed at a flexible interface that can be used for interconnection of many different types of devices.").)

To support its non-obviousness arguments, Rambus ignores the disclosure of Bennett and Rambus's own expert's description of Bennett to assert that Bennett primarily "discloses a mainframe computer system" (Rambus's Br. at 19) and to suggest that Bennett would not have been concerned with interconnecting memory devices. (Rambus's Br. at 57.)[1]

Of relevance to this appeal, Bennett describes the interconnection of VLSIC "User" devices over a Versatile Bus. (A1305(12:28-32); A1317(35:59-61).) Bennett's User device can be "a central processor or a memory or whatever." (A1319(40:52-55); A1317(35:59-62).) Memory User devices are "passive" and "unsophisticated," unlike "sophisticated" processor User devices. (A1328(58:60-

---

[1] In fact, Bennett only uses the term "mainframe" once in passing. (A1328(57:59-61).)

67); A1317(35:59-62); A1356(116:1-6).) In fact, Bennett's synchronous Versatile Bus does not have to be used for a sophisticated computer system, but can be used for "trivial" configurations "to pass but a single bit of data from a single master device [CPU User] to a single slave device [memory User]." (A1307(15:42-53); *see also* A1328(57:54-59) ("a chip part – say a microprocessor – will likely be as good in one Versatile Bus network – say one containing only a single slave memory – as the next Versatile Bus network.").)

"Each Versatile Bus Interface Logics services a User as well as communicating across the Versatile Bus with other Versatile Bus Interface Logics. Therefore, an interface is presented to the User, which may be on a separate chip or, *as is more common, will be on the same physical substrate upon which the Versatile Bus logics are implemented in VLSIC.*" (A1324(50:7-17); A1317(36:19-25).) Thus, Bennett discloses that the User can be memory and that the User and interface are both components of a single chip, as illustrated in Figure 1:



**(A1046)**

Bennett's Figure 1 is nearly identical to Figure 2 from the '037 Patent where

Bennett's User device corresponds to the '037 Patent's CPU, ROM, and DRAM

and the Versatile Bus Interface corresponds to the '037 Patent's Device Interface.



**'037 Patent Figure 2 (A65)**

6

Rambus admits Bennett employs a synchronous Bus to interconnect the Users. (A1332-33(66:9)-67:19); A27[¶B2]; Rambus's Br. at 34 ("Bennett discloses many possible Users that can be connected to the synchronous Versatile Bus.").) However, Rambus asserts that signals between the Versatile Bus Interface and the User would be asynchronous, even though Bennett expressly states otherwise. (A1350(101:50-54) ("The timing diagram of Fig. 52a firstly shows as reference the signals (H) φ1 and (H) φ2 *to which all communication between the Versatile Bus Interface Logics and the User*, and upon the Versatile Bus, is synchronously referenced.").) Thus, to the extent it is relevant to claim 34, the communication between the memory User and the Versatile Bus Interface is synchronous with respect to an external clock signal.

As an example of how a CPU User device can access a memory User device, Bennett discloses Figure 38, reproduced on the following page, where "device A and device B are processors that predominantly respectively reference memories device C and device D" over the synchronous Versatile Bus. (A1349(97:7-10) (internal numbering omitted).)



**Bennett Figure 38 (A1070)(annotated)**

Next, Bennett discloses two types of memories that can be used, 1) a large slow memory and 2) a small fast memory, which are well-known descriptions of DRAM and SRAM (static random access memory) respectively. (A1345(92:9-14); A1443(2:18-23); A10005.) In Figure 36, Bennett provides a detailed example of a large memory write operation. (A1347(95:58-96:42).) The memory request is sent from a "User requester" and received by a "User large memory." (A1347(96:25-42).)

Finally, Bennett also discloses other more complex memory operations including masked write, block write, and read-modify-write. For example, if an operation code indicated function number 2, the memory would be instructed to perform a read-modify-write. (A1067.) Thus, this single operation code would

instruct a memory device to first perform a read, then automatically perform a write. (A1345(91:13-23).)

## 2. Wicklund

Wicklund describes memory accesses of DRAMs, specifically an improved system for well known "page mode" or "normal [or non-page] mode" accesses. (A1443-44(2:45-3:6).) In page mode, "the DRAM holds the data in the column sense amps or latches from the previous read or write operation. If a subsequent request to access data is directed to the same row [*i.e.*, page], the DRAM does not need to wait for the data to be sensed…" (A83(10:31-38); *see also* A1443(1:57-60; 2:28-39).) Simply stated, page mode results in maintaining the data in the sense amplifiers and not precharging after a memory operation.

In "normal mode," (or "non-page mode") the data is not left in the sense amplifiers for subsequent requests and the sense amplifiers are precharged after each request. (A1443-44(2:62-3:6); A83(10:25-31).) Instead of leaving the row (page) of data in the sense amplifiers for a subsequent access as is done in page mode, a normal mode operation is followed by an automatic precharge operation. (A83(10:47-50).)

The normal mode and page mode disclosed in Wicklund operate the exact same way as the "typical settings" for precharge described in the '037 Patent.

(A83(10:50-55) ("Typical settings are 'precharge after normal access' and 'save after page mode access.'").)

Page mode is faster than normal mode if successive memory accesses are on the same row, otherwise a page "miss" time access penalty occurs. (A1443(2:45-55); A28-29[¶W3].) In other words, "if the new request is in a different row, that [page mode] access will actually be slower than for a standard DRAM access." (A1443(2:45-55).) This description is nearly identical to how page and normal modes are described in the '037 patent. (A83(10:25-46).)

To address this time access penalty, Wicklund describes that "an optimal controller for page mode operation of main DRAM memory could include some means of automatically switching between page mode and non-page mode of DRAM operation depending on some prediction of whether the next access will be on the same page or on another page." (A1443(2:55-61).) When the system described in Wicklund decides to switch to normal/non-page mode, a normal/non-page mode would result in writing the data back into the array followed by automatically precharging the sense amplifiers after the memory operation.

### 3. Bowater

Bowater describes the use of page mode to provide rapid access to data stored in a previously accessed row of memory. (A1461(6:15-17).) During a page mode access, the sense amplifiers retain previously accessed data rather than

10

storing the data back into the array and precharging. Bowater also explains there is a maximum time that the row of data can remain open. (A1462(7:54-56; 7:62-65); A1457.) To ensure that this maximum time is not exceeded, Bowater explains that information is received as part of the memory request which sets a counter to automatically trigger the sense amplifiers to store the data back into the array and precharge. (A1462(7:62-65); A1457.)

Bowater's teaching to automatically precharge when the sense amplifiers have not been refreshed in a certain time period is the same as the time period embodiment for precharge described in the '037 Patent. (A83(10:50-55) ("The DRAM can also be set to precharge the sense amps if they are not accessed for a selected period of time.").)

### 4. JEDEC

JEDEC provides a standard for operation of SDRAM devices. (A10057; A10083; A10111.) Rambus accuses JEDEC compliant devices of infringing claims of the Farmwald patent family, which includes the '037 patent. (A2080.)

Although JEDEC was published in 1999 after the alleged priority date of the '037 Patent, Micron argued throughout the reexamination proceeding that JEDEC constitutes prior art because claim 34 is not entitled to a filing date earlier than February 4, 2002. (A1749-1763.)

### 5. Park

Park describes a "synchronous dynamic random access memory which is capable of accessing data in a memory cell array disposed therein in synchronism with a system clock from an external system such as a central processing unit (CPU)." (A10307(1:9-14).) Figures 5a and 5b of Park disclose activate, read, write, precharge, and refresh operations and show a command that is sampled synchronously with respect to external clock CLK. (A10246.)

Although Park was filed after the alleged priority date of the '037 Patent, Micron argued throughout the reexamination proceeding that Park constitutes prior art because claim 34 is not entitled to a filing date earlier than February 4, 2002. (A1749-1763.)

### D. Background of the Technology at Issue

While it appears that Rambus is attempting to provide background of the technology, Rambus actually interjects argument regarding the alleged non-obviousness of claim 34 of the '037 Patent. Accordingly, Micron will address Rambus's arguments regarding the technology in this section.

### 1. Dynamic Random Access Memory

Rambus alleges that the '037 Patent improves upon prior art memory due to two features: "1) employing a synchronous memory interface between the memory controller and the DRAMs; and 2) using multi-bit operation codes that include both read/write instructions and instructions regarding 'precharge.'" (Rambus's Br.

12

at 3.) Yet, neither of these features is recited in claim 34. Rather, the preamble of claim 34 recites, "a synchronous dynamic random access memory device" and the body of claim 34 requires only "sampling an operation code synchronously." (A92.)

Notably, claim 34 does not recite the phrase "synchronous DRAM" that Rambus uses throughout its brief. At most, the preamble term, "synchronous dynamic random access," modifies the term "memory device" that is used in the body of claim 34. "Memory device" is a term previously construed by this court. *In re Rambus Inc.*, 694 F.3d 42, 46-48 (Fed. Cir. 2012). Moreover, even under Rambus's shorthand, the term should be read as a "synchronous DRAM device" and not a "synchronous DRAM."

Rambus does not dispute DRAMs were well-known at the time of the alleged priority date for the '037 Patent, but contends that the conventional DRAM device was asynchronous. (Rambus's Br. at 3.) Rambus urges that to determine whether a DRAM device is synchronous, "one must look to the specific bus to which *that chip* is attached." (Rambus's Br. at 10 (emphasis in original).)[2] However, rather than follow its own proposed instructions, Rambus's arguments

---

[2] While couched in terms of what signal a single chip DRAM device receives, this primary and secondary bus argument that Rambus relies on (Rambus's Br. at 8) was never presented to the Board in Rambus's briefs. This Court should not address arguments that were never presented to the Board. *See In re Watts*, 354 F.3d 1362, 1367-68 (Fed. Cir. 2004). Before the Board, Rambus argued only that Bennett's User device was not a single chip, and the Board found otherwise. (A26.)

13

are premised on whether or not the DRAM itself is directly connected to a synchronous bus rather than on whether a single chip DRAM device is connected to a synchronous bus. Rambus does so because Rambus does not dispute that the single chip memory device in Bennett is connected to a synchronous Versatile Bus. (Rambus's Br. at 34.)

Even if claim 34 required that a bus directly connected to the DRAM operate synchronously, Bennett discloses that the bus connected directly to the User memory is synchronous (which is in addition to the undisputedly synchronous Versatile Bus). (A1350(101:50-54) ("The timing diagram of Fig. 52a firstly shows as reference the signals (H) φ1 and (H) φ2 *to which all communication between the Versatile Bus Interface Logics and the User*, and upon the Versatile Bus, *is synchronously referenced*.").)

Further, the Board correctly determined, based on substantial evidence from the record, that a synchronous DRAM would have been obvious to a person having ordinary skill in the art in light of the teachings of Bennett in view of Wicklund or Bowater. (A26-27[¶¶B1-B2]; A29.) For a determination of obviousness, a single piece of prior art does not have to explicitly teach the complete limitation. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981). Rather, the question for obviousness is whether the limitation would have been obvious to a person having ordinary skill in the art in view of the prior art as a whole. *Id.* Here, the Board correctly found that Bennett discloses synchronous memory devices and that synchronous

14

communication was more efficient than asynchronous communication. (A1332-33(66:9-67:190; A27[¶B2].) In addition, DRAM was an undisputedly well-known type of memory, as exemplified by Wicklund. (A29.) Thus, the Board correctly concluded that a synchronous DRAM would have been obvious to one of ordinary skill in the art. (A29.)

Rambus has not provided any evidence showing that the Board erred in determining that a synchronous DRAM would have been obvious in light of the teachings of the prior art. Rambus asserts the declaration of Mr. Murphy supports its contention (Rambus's Br. at 8.); however, Rambus cites to portions from Mr. Murphy's declaration that are not even directed to this issue. In the first instance, Rambus's alleged support relates to a prior art reference[3] that is not the subject of this Appeal. (A1611(¶¶49-51).) In the second instance, Rambus's alleged support relates to a discussion of Bennett's disclosure of "large memory" and "fast memory," which relates only to whether the memory is a DRAM, not whether it is synchronous. (A1625-26[¶¶92-93].) Indeed, the evidence of record directly contradicts Rambus's allegations in that synchronous DRAMs were known at least as early as 1972. (*See* A10349 (The Intel 4002 is a "RAM" controlled by two external clock signals φ1 and φ2 (*i.e.*, synchronous) and included "[i]nternal refresh circuitry [that] maintains data levels in the cells" (*i.e.*, dynamic).)

---

[3] Intel Corporation, *iAPX 432 Interconnect Architecture Reference Manual* ("iAPX").

## 2. Prior Cases Involving Synchronous "Memory Devices"

Rambus argues that the holdings from other proceedings support its contention that there is a difference between a "synchronous dynamic random access memory device" and a "generic" synchronous memory device. (Rambus's Br. at 9-10 (referencing *In re Rambus Inc.*, 694 F.3d at 46-48).) The issue in *In re Rambus* was whether a "synchronous memory device" was limited to a memory device on a single chip or whether the memory device could comprise more than one chip. *In re Rambus*, 694 F.3d at 47. This Court held that there was no indication that the memory device must be made of only one chip and that the memory device could contain some control circuitry. *Id.*

Rambus now attempts to distinguish that holding by arguing that the claim construction of "synchronous dynamic random access memory device" requires "the memory to be on a *single integrated memory chip.*'" (Rambus's Br. at 10 (citing A1480).) That construction was not addressed before the Board because it is indisputable that Bennett discloses the Versatile Bus Interface and the User Memory are part of a single integrated chip. (A26[B1]; A1324(50:7-17); A1317(36:19-25).)

Rather than address that finding, Rambus now argues that in determining whether the DRAM device is synchronous, one must look to the bus between the DRAM and its interface based on a statement by the Examiner. (Rambus's Br. at

10.) In doing so, Rambus misconstrues the examiner's statement that "while a synchronous interface to a DRAM would provide a synchronous memory system, the claims require the DRAM itself to be synchronous and not just an interface." (A1480; *see also* A1481.) However, the examiner made that statement in light of prior art references that taught a synchronous interface that is on a *different* chip than the memory. *Id*. In contrast, Bennett discloses the synchronous interface is on the *same* chip as the memory. (A1350(101:50-54).) Thus, the examiner's statement has no relevance to Bennett, which discloses a synchronous memory chip.[4]

### 3. Precharging of Sense Amplifiers

Rambus urges that the inventors of the '037 Patent were able to achieve a more efficient memory system in part by "using multi-bit operation codes that include both read/write instructions and instructions regarding 'precharging.'" (Rambus's Br. at 7.)[5]

Precharging is used to help prepare memory for the next memory operation. For purposes of this appeal, the most relevant aspect of precharge is how it is used in two well-known modes of memory operation: 1) normal/non-page mode and 2) page mode. First, in normal/non-page mode the memory should be automatically

---

[4] Even considering Rambus's position, Bennett discloses the bus between the interface and the memory is synchronous. (A1350(101:50-54).)

[5] Claim 34 does not require the operation code to be "multi-bit," but, nevertheless, this is irrelevant to Bennett as the Board determined Bennett discloses a multi-bit operation code. (A6.) That finding was not appealed.

precharged in order to prepare the memory for the next operation. For example, the '037 Patent acknowledges: "In normal mode (*in conventional DRAMs* and in this invention), the DRAM column sense amps or latches have been precharged to a value intermediate between logical 0 and 1." (A83(10:25-31).) Precharging for normal/non-page mode operation is similarly described in the prior art. (*See e.g.*, A1443-44(2:62-3:6).)

In addition, Rambus's expert stated in the underlying litigation "[t]he normal mode read is essentially equal to, similar to a read with auto precharge." (A1743; *see also*, A10334 ("the 'Read' and 'Read with Autoprecharge' described by Mr. Murphy perform the equivalent function of identifying 'normal' mode read and 'page' mode read"); and A10346.)

Second, when memory has been in page mode for an extended period of time, it is necessary to precharge the memory after a certain amount of time in order to avoid data corruption. The '037 Patent acknowledges this: "The DRAM can also be set to precharge the sense amps if they are not accessed for a selected period of time." (A83(10:50-55).) Likewise, the prior art also describes precharging after a certain time has elapsed in page mode to avoid data corruption. (A1462(7:62-65).)

### 4. Alleged Objective Evidence of Non-Obviousness

Rambus purports to present "objective" secondary considerations of non-obviousness. (Rambus's Br. at 17-19.) Further, Rambus's presentation of general evidence about Rambus's proprietary RDRAM product fails to establish a nexus or show that its commercial embodiment is commensurate in scope with claim 34.[6] To qualify as a secondary consideration, a commercial embodiment must be coextensive with the claimed features in order to be accorded substantial weight. *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

Rambus fails to show how the alleged improvements in speed and efficiency, or how the alleged commercial success, was due solely to the limitations recited in claim 34, rather than other factors. Indeed, the evidence shows the exact opposite. For example, Rambus relies on its own statements that it created "revolutionary memory chip technology offering tenfold increase," but never once attributes the revolutionary technology to using a synchronous DRAM device with an operation code that includes a write instruction and a precharge instruction. (Rambus's Br. at 18.) At a minimum, these alleged breakthroughs could have been due to any number of the purported inventions mentioned in the

---

[6] Tellingly, Rambus relied upon the same purported evidence of secondary considerations in each one of 10 *inter partes* reexaminations that were pending for the Farmwald family patents. The fact that Rambus relies on the identical evidence regardless of the differing subject matter encompassed by the claims at issue in each reexamination highlights the lack of any possible nexus to claim 34.

specification of the '037 patent and/or Rambus's RDRAM technology of the time. (A2443[¶86]("[t]he RDRAM technology in the early 1990's included numerous inventions relating to the bus, the interface between the bus and computer chips, and the DRAM.").)

Even assuming RDRAM had been revolutionary and successful, which it was not, any success would have been dependent on any number of inventions apart from claim 34. Rambus fails to show any considerations that are tied to the limitations of claim 34. Likewise, Dr. Horowitz's IEEE award was directed to multiple contributions to the industry and not specifically to the limitations of claim 34.

While Mr. Murphy states there was skepticism, he, as well as the materials provided by Rambus, fail to identify who exactly was skeptical. Rambus also asserts that skepticism existed as to the "'500 megabit per second DRAM data rate'" which is not recited in any claim 34 of the '037 Patent. (Rambus's Br. at 19 (citing A2446).) Even if skepticism existed, it is irrelevant to claim 34.

Further, Rambus relies on the testimony of Dr. Horowitz and Dr. Farmwald (both named inventors, as well as Rambus founders who own a significant amount of Rambus stock), and the declaration of Mr. Murphy (Rambus's paid expert) for the assertion of "skepticism by many experts in the field." (Rambus's Br. at 19.) The Federal Circuit has criticized such non-objective evidence in analogous

circumstances. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005); *see also In re Mettke*, 570 F.3d 1356, 1361 (Fed. Cir. 2009); *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323 (Fed. Cir. 2008).

Lastly, Rambus attempts to argue that others failed at their "attempts to solve the memory bottleneck problem without incorporating the features disclosed in the '898 application and the '037 patent." (Rambus's Br. at 19.) Here, Rambus cites Mr. Murphy's declaration which states that two types of asynchronous technologies, "burst EDO" and "High Speed Toggle," were not commercially successful. (Rambus's Br. at 19 (citing A1642).) Even if that statement were true, the failure of Burst EDO and High Speed Toggle does not support Rambus's position that the success of DRAM or SDRAM is due to the limitations of claim 34 of the '037 patent.

### E. Summary of the Proceeding Prior to this Appeal

During the initial examination, the Examiner determined claim 34 was patentable over the rejections proposed by Micron. Micron appealed to the Board and the Board reversed the Examiner.

### 1. Rejection Based on Bennett In View of Wicklund or Bowater

In its appeal to the Board, Micron argued that the examiner erred in withdrawing the rejection of claim 34 and demonstrated that Bennett in view of Wicklund or Bowater rendered obvious the two limitations that Rambus raises

before this Court: (1) a "synchronous dynamic random access memory device" and (2) an operation code including a write instruction and a precharge instruction. (A1740-A1748.)

Micron demonstrated that Bennett describes the interconnection of VLSIC "User" devices over a Versatile Bus. (A1740; A1305(12:28-32); A1317(35:59-61).) Bennett provides a User device can be "a central processor or a memory or whatever." (A1740; A1319(40:52-55); A1317(35:59-62).) Micron also demonstrated that Bennett disclosed synchronous clocked communication to interconnect the Users. (A1740; A1332-33(66:9-7:18).)

Micron argued that Bennett's description of a large slower memory (A1345(92:9-14)) would have been understood to be DRAM to a person having ordinary skill in the art in part because prior art references, such as Wicklund, demonstrated that DRAM was "the most popular form of read/write memory." (A1443(1:36-39); A10005.) In addition, Micron argued it would have been obvious to implement the synchronous memory of Bennett using DRAM, particularly in light of DRAM being the one of the most popular forms of memory at that time. (A1741-1742; A1443(1:36-39).)

Micron also demonstrated that Bennett disclosed memory operation codes, such as a write operation. (A1742; A1069; A1347-48(95:98-96:42).) The memory request is sent from a "User requester" and received by a "User large memory."

(A1741-1742; A1347(96:25-42).) In addition, Micron demonstrated that Bennett disclosed multi-function memory operations, such as a read-modify-write. (A10375; A1067.)

Although Bennett discloses a write operation code, it does not state expressly that the write operation code includes an instruction that "further specifies that the memory device precharge." However, Micron demonstrated that this limitation would have been obvious to one of ordinary skill in the art in light of the teachings of Wicklund or Bowater (A1742-1748), and that the '037 Patent specification and Rambus's expert admitted that precharge was a well-known and predictable function. (A1743; *see also* A10334; A10346.)

Micron demonstrated that Wicklund discloses improving speed to systems in page mode by including a "means of automatically switching between page mode and non-page mode of DRAM operation." (A1443(2:55-61); A1744-1745.) When Wicklund's system switches to normal/non-page mode, the data is written back into the array followed by automatically precharging the sense amplifiers. (A1744-1745.) Moreover, during the appeal proceeding, Rambus did not dispute that prior art systems typically precharge after a memory request in non-page mode. (A30; *see also* A83(10:25-31).)

Micron demonstrated that an obvious means to provide the memory device with the instruction to automatically switch between page mode and normal/non-

page mode would have been to utilize Bennett's operation code. (A1746.) In other words, it would have been obvious to one of ordinary skill in the art to include a precharge instruction taught by Wicklund with the memory operation code taught by Bennett. (A1746.) As Bennett already provides a flexible interface and operation codes that accommodate multiple functions, the proposed modification to include a well-known precharge function in the same operation code as the write instruction would be a simple implementation to one of ordinary skill in the art.

Likewise, Micron demonstrated that Bowater describes a known problem with page mode – a time limit must be placed on how long a row of memory may be left open. (A1747-1748; A1462(7:54-56; 7:62-65); A1457.) Bowater teaches that a row must not be left open too long before it becomes corrupted. (A1462(7:54-8:8); A1748.) To that end, Bowater explains that a counter may be set to automatically perform a precharge after the memory access is completed in order to prevent corrupted memory. (A1462(7:62-65); A1457.) Micron argued that it would have been obvious to include a precharge instruction as taught by Bowater in a write operation code as taught by Bennett to automatically perform a precharge after a certain length of time in page mode to prevent the memory from becoming corrupt. (A1748.)

Based on the foregoing arguments, the Board determined that Bennett in view of Wicklund or Bowater rendered obvious claim 34. (A39.)

### 2. Response to Rambus's Arguments Made in its "Statement of Facts" Regarding Micron's Appeal to the Board

In providing an alleged summary of Micron's appeal brief to the Board, Rambus interjects numerous arguments regarding the disclosure of Bennett. First, Rambus argues that the system of Bennett would not provide an operation code that included both a write instruction and an automatic precharge instruction. (Rambus's Br. at 25.) As will be demonstrated below, the Board correctly determined, based on substantial evidence, that including a precharge instruction and write instruction in Bennett's synchronous multiple function write control operation code amounts to no "'more than the predictable use of prior art elements according to their established functions.'" (A31 (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007).)

Rambus also argues that, at the oral hearing before the Board, "Micron argued for the first time that Bennett's 'read-modify-write' instruction constitutes a 'multi-function' operation code." (Rambus's Br. at 26.) Rambus is incorrect, however, as Micron addressed the teachings of Bennett's read-modify-write instruction in its appeal briefing. (A10375.)

Nevertheless, Rambus argues that Bennett's read-modify-write operation does not actually contain two "independent and distinctly identifiable instructions." (Rambus's Br. at 27.) In sum, Rambus argues that Bennett's read-modify-write instruction does not provide a "bundled" operation code, but rather "reads data in

that memory address and writes a new value to that same address." (Rambus's Br. at 27.) Yet, Rambus appears to concede that two operations are occurring: a read and a write. Nothing in the claim requires the operation code to have "independent and distinctly identifiable instructions," and Rambus does not explain what that new limitation would mean in light of the specification. Rambus may not properly "independent and distinctly identifiable instructions" into the claim. *See Superglide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

Even if Bennett did not disclose any operation codes with multiple functions, the findings of the Board and teachings of the prior art amply support that modifying Bennett's operation code to include a precharge instruction would have been a predictable task to one of ordinary skill in the art that would have resulted in providing the well-known benefits of precharge to Bennett's operation codes.

### 3. Rejections Based on JEDEC and Park

The '037 Patent purports to claim priority to the parent '898 application, filed April 18, 1990. During reexamination, the examiner found that the '037 Patent was entitled to the priority date of the '898 application and refused to adopt rejections based on the intervening references, JEDEC and Park. (A10407-10408.)

In its appeal to the Board, Micron argued that the examiner erred in determining that claim 34 is entitled to an effective filing date earlier than the

February 4, 2002 filing date of the '037 Patent. (A1749-1763.) Accordingly, the examiner erred in not adopting the rejections of claim 34 as anticipated by JEDEC and as rendered obvious by Park in view of JEDEC. Despite Micron's showing that claim 34 lacked the required written description (because it did not claim the multiplexed bus interface of the invention described in the '898 application), the Board disagreed with Micron and determined that the examiner did not err in determining that claim 34 of the '037 Patent is entitled to the benefit of the April 18, 1990 filing date. (A35-39.)

### 4. The Board's Decision

In its Decision issued January 27, 2012, the Board reversed the examiner's confirmation of claim 34 as patentable. (A23.) Concerning the examiner's findings, the Board stated that "the findings in the RAN supporting [this Board Decision] are also adopted." (A25.) As such, findings by the examiner that are inconsistent or conflict with the Board's findings were considered irrelevant or erroneous.

The Board made numerous factual findings to support reversal of the examiner. First, the Board determined Bennett disclosed an integrated circuit user device that includes memory. (A26-27[¶B1].) The different memory types are either, relatively, small and fast or large and slow and are connected to a synchronous bus using synchronous clocked communications. (A26-27[¶B1; ¶B2].) The Board further found that the prior art disclosed "DRAMs were a well-

known, if not dominant, form of a memory chip device," and neither party contested that DRAMs were ubiquitous. (A29.) Thus, the Board concluded that it would have been obvious to use a synchronous DRAM device. (A29.)

The Board next held that two typical well-known modes for DRAM writes existed at the time of the '037 Patent invention: a normal/non-page mode and a page mode. (A30-31.) First, when in normal/non-page mode, the prior art typically precharged DRAMs after a read/write operation, which Rambus does not dispute. (A30 and n.9.) Second, the Board found Wicklund and Bowater explained that there is a time limit on how long the DRAM can be in page mode since DRAMs need to be refreshed at regular intervals. (A28[¶W2]; A31.) Accordingly, the Board found the prior art teaches that page mode may need to be interrupted with a precharge to refresh the DRAM. (A28[¶W2].)

The Board further held that Bennett disclosed controlling memory chips using multiple functions in a write code and banding together related write signals in one code. (A30.) For example, Bennett's disclosure of a read-modify-write represents a write code providing multiple functions. (A27[¶B3].) The Board also held that "the precharge and write functions (and their signals) are intimately coupled together in the prior art systems, support[ing] the obviousness of the disputed limitations of claim 34 requiring the signals to be in a single op code." (A30.)

28

The Board continued with an alternative analysis to hold that the prior art rendered claim 34 obvious. (A31.) The Board identified, from the teachings within Wicklund and Bowater, that if a DRAM is in page mode too long, it must be closed and precharged to avoid data corruption. (A31.) Accordingly, if the row address request matched the previous request during page mode for several write cycles, then the system sends a signal to close the row after the current write to institute a precharge after that write. (A31.) Thus, the Board held it would have been obvious to send a precharge signal in the same operation code as a write signal in order to ensure that a DRAM row in page mode is not kept open for too long. (A31-32.)

Moreover, the Board found Wicklund explained its device will automatically change from page mode to normal/non-page mode dependent upon a prediction algorithm. (A28-29[¶W2].) Thus, the prior art teaches a precharge signal is required when there is a switch from page mode to normal/non-page mode.

The Board also explained the error in the examiner's position. The Board explained that the examiner's factual findings were supported "to an extent" because the examiner found that the row closing causes a precharge on the current row, *and then* writing on the next row occurs. (A32 (citing A1512-1513).) However, the examiner failed to consider that Wicklund and Bowater teach that if a DRAM is in page mode too long, it must be closed and precharged to avoid data

corruption. (A31.) Thus, the current row will close after a write and a precharge will occur on *the same row* after that write to interrupt the page mode. (A31.) Further still, the examiner erred by failing to consider that precharge normally followed a write in non-page mode. (A33.)

Based on its analysis of the evidence of record, the Board held that modifying Bennett's synchronous multiple function write control operation code with the precharge teachings of Wicklund "amounts to no 'more than a predictable use of prior art elements according to their established functions.'" (A31, citing *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007).)

The Board then fully considered the evidence of secondary considerations and concluded that such evidence failed to establish a nexus between the claimed features associated with claim 34 and the allegations of success, solving a long felt need, etc. (A34-35.)

After considering the evidence of record, providing relevant findings of fact, and reviewing the examiner's decision and the parties' arguments, the Board concluded the examiner erred in not maintaining the obviousness rejection of claim 34. (A39.)

Finally, the Board determined that the '037 Patent was entitled to a priority date of April 18, 1990. (A35-39.) As such, the Board refused to review whether JEDEC anticipated, or Park in view of JEDEC rendered obvious, claim 34 of the

'037 Patent. The Board's finding that the examiner did not err with respect to the priority issue was premised on its perception that the claim construction determination in *Rambus Inc. v. Infineon Technologies AG*, 318 F.3d 1081, 1095 (Fed. Cir. 2003), controls the written description priority issue for this case. Micron presented arguments, including citing a post-*Infineon* decision by this Court that stated "it would certainly be reasonable to conclude that Rambus's claims do not meet the written description requirement." *Hynix Semiconductor Inc. v. Rambus Inc.,* 645 F.3d 1336, 1352-1353 (Fed. Cir. 2011). Despite Micron's arguments, the Board agreed with the examiner's priority determination.

## IV.   <u>SUMMARY OF THE ARGUMENT</u>

Rambus has the burden to show that the Board committed reversible error. *In re Watts*, 354 F.3d at 1369. In a misguided attempt to show error, Rambus highlights the examiner's factual findings and reasons that because the Board relied on similar factual findings as the examiner, the Board necessarily erred by arriving at a different conclusion. This Court, however, "will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Board's finding from being supported by substantial

evidence." *Hoover Co. v. Royal Appliance Mfg. Co.*, 238 F.3d 1357, 1361 (Fed. Cir. 2001).

A repeated flaw in Rambus's arguments is its attempt to argue that each limitation must be disclosed by a single prior art reference in order to constitute "substantial evidence" for a determination of obviousness. The case law expressly refutes those types of arguments. *KSR*, 550 U.S. at 417-418; *see also In re Merck & Co. Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986). Consistent with those cases, the Board's Decision properly "articulate[s] reasoning with some rational underpinning," *KSR*, 550 U.S. at 418, as to why it would have been obvious to a person having ordinary skill in the art to combine well known elements based on the facts established in this proceeding.

The only error in the Board's decision was determining that claim 34 had priority to the April 1990 filing date of the '898 application. (A35.)

## V.    **ARGUMENT**

### A. Standard of Review

With regards to the adopted rejections, Rambus has the burden to show that the Board committed reversible error. *In re Watts*, 354 F.3d at 1369. This Court reviews the Board's legal conclusion, including obviousness, *de novo* while upholding the Board's underlying findings of fact that are supported by substantial

evidence. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000); *In re NTP, Inc.*, 654 F.3d 1279, 1297 (Fed. Cir. 2011).

In its appeal, Rambus has contested issues directed to what the prior art discloses and the reason to combine references, both of which are a questions of fact that should be reviewed on the substantial evidence standard. *In re Hyatt*, 211 F.3d 1367, 1371 (Fed. Cir. 2000); *Para-Ordnance Mfg. v. SGS Importers Int'l, Inc.*, 73 F.3d 1085, 1088 (Fed. Cir. 1995). "The 'existence of a reason for a person of ordinary skill to combine references' is a question of fact that we review for substantial evidence." *In re Hyon*, 679 F.3d 1363, 1365-66 (Fed. Cir. 2012) (citing *In re Constr. Equip. Co.*, 665 F.3d 1254, 1255 (Fed. Cir. 2011)).

Substantial evidence "is something less than the weight of the evidence but more than a mere scintilla of evidence," *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000), and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

## B. The Examiner's Findings Do Not Undercut the Board's Determination of Obviousness

Rambus cites several findings made by the examiner during the reexamination proceeding which resulted in a withdrawal of the rejections. (Rambus's Br. at 44-47.) Rambus then argues that the Board agreed with those factual findings, "to an extent," but erroneously drew a different conclusion on

33

obviousness. (Rambus's Br. at 48.) In short, Rambus contends that, when it comes to a conclusion of law, the Board's Decision must be identical to the examiner's findings unless the Board finds an error in the facts relied on by the examiner.

As held by this Court, however, if "the evidence in [the] record will support several reasonable but contradictory conclusions," then this Court "will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d at 1320. "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966). As demonstrated herein, the Board determined that substantial evidence supported a conclusion of obviousness even though the examiner came to a different conclusion.

Rambus also argues that the Board failed to explain error in the examiner's findings. (Rambus's Br. at 31, 44.) However, the Board is not required to do so. "[T]he Board's primary role is to review adverse decisions of examiners including the findings and conclusions made by the examiner." *Ex parte Frye*, 94 USPQ2d 1072, 1077 (BPAI 2010) (precedential); *see also* 35 U.S.C. § 6(b) (2002).[7]

---

[7] The current version of § 6(b) (P.L. 112-283, Sept. 16, 2012, approved 1-15-13) enumerates the Board's duties.

"Specifically, the Board reviews the particular finding(s) contested by an appellant <u>anew</u> in light of all the evidence and argument on that issue." *Id*. at 1075. The Board does, of course, "necessarily weigh all of the <u>evidence and argument</u>" when it is reviewing findings of the examiner anew. *Id*. at 1075 (quoting *In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992)).

Under the USPTO's review procedures, no deference should be given to the examiner with respect to determinations of fact and, likewise, of law, *e.g.*, obviousness. The former USPTO director has explained the USPTO's review procedures in light of the decision in *Frye*: "This means that the Board does not give deference to positions taken by the examiner when considering an appellant's argument specifically challenging the examiner's findings." http://www.uspto.gov/blog/director/entry/ex_parte_frye_bpai_s. The Director's reasoning is supported by this Court's case law as well. *See In re Berg*, 320 F.3d 1310, 1315 (Fed. Cir. 2003) ("examiners *and administrative patent judges on the Board* are responsible for making findings … as to the meaning of prior art references to persons of ordinary skill in the art and the motivation those references would provide to such persons").

Indeed, in reversing the examiner's determination, 37 C.F.R. § 41.77(a) only requires that the Board provide an opinion in support of its decision, but does not require the Board to detail the error in the examiner's findings. Therefore, neither

the statute nor the rule requires the Board to explain error in the examiner's underlying findings in order to draw a different conclusion. Moreover, 37 C.F.R. § 41.77(b) provides that the Board may issue a new ground of rejection "should the Board have knowledge of any grounds not raised in the appeal for rejecting any pending claim…" Therefore, the Board can issue a new rejection based on its own factual findings even without reliance on factual findings of an examiner.

Here, the Board reviewed the parties' arguments and the examiner's position for withdrawing the grounds of rejection. As will be discussed further herein, the Board found error in the examiner's position and, contrary to Rambus's argument, provided the reason for finding error. (*See, e.g.,* A32.) The Board provided its relevant findings of fact, legal authority, and analysis necessary to address the issue of whether claim 34 would have been obvious in light of the prior art.

Even assuming the examiner's findings should be accorded some amount of deference, which they should not, Rambus improperly asserts that the Board is bound by those findings. (Rambus's Br. at 44-47.) For example, Rambus provides a quote from the examiner that DRAMs do not inherently receive precharging information from an operation code as if it were case dispositive. (Rambus's Br. at 44-45 (citing A1529).) Although the Board is not bound to accept the Examiner's finding, in this case the Board did not conclude precharging through an operation code was an *inherent* feature, but rather determined that the prior art (viewed as a

whole) *rendered obvious* the inclusion of a precharge instruction with a write instruction in an operation code. (A30.)

Rambus also cites a number of statements showing that the examiner does not believe Wicklund discloses sending a precharge instruction in an operation code to automatically precharge after data is written. (Rambus's Br. at 45.) Yet, Micron never contended Wicklund alone discloses claim 34. The findings regarding what Wicklund fails to *anticipate* would not impact the Board's determination that the teachings of Bennett in view of Wicklund render claim 34 *obvious*.

In addition, Rambus ignores the examiner's position that "[a]s specifically disclosed by Wicklund, page mode is automatically turned on or off based on a prediction of whether or not the next access will be at the same DRAM row address as the last one." (A1498.) On this fact, the Board noted the examiner failed to consider that "the controller signals a precharge after shifting from the page mode to the normal mode and writing to a new row pursuant to the shift." (A32-33.) Thus, when the system switches from page mode to normal/non-page mode, the row closes, and the system writes data to the newly requested row and automatically precharges the internal circuitry. (A32.) The Board also noted that Rambus agreed with this characterization. (A30.) Regarding Bowater, Rambus cites to a number of statements showing that the examiner does not believe

Bowater discloses all limitations of claim 34. (Rambus's Br. at 46-47.) However, Micron never contended Bowater alone discloses claim 34. The findings regarding what Bowater fails to anticipate would not impact the Board's determination that the teachings of Bennett in view of Bowater render claim 34 obvious.

Micron acknowledges that examiners are held to be "persons of scientific competence in the fields in which they work" and "are responsible for making findings, informed by their scientific knowledge, as to the meaning of prior art references to persons of ordinary skill in the art and the motivation those references would provide to such persons." *In re Berg*, 320 F.3d at 1317. However, the same is true of the Board. *Id*.; *see also* 35 U.S.C. § 6(a) ("administrative patent judges shall be persons of competent legal knowledge and scientific ability"). Nothing in the case law remotely states that the Board is bound to accept an examiner's findings as absolute.

Accordingly, Rambus's cited findings by the examiner have little probative value since (1) examiner findings are accorded no deference and (2) the quotations clearly demonstrate that the examiner erred in failing to view the combined teachings of the prior art as a whole.

### C. The Board May Rely On Its Scientific Knowledge In *Inter Partes* Reexamination Proceedings

Throughout its Brief, Rambus argues that the Board improperly substituted its own expertise in determining that claim 34 was rendered obvious by the cited

prior art. (Rambus's Br. at 42-43, 53.) Rambus's reliance on *Brand v. Miller*, 487 F.3d 862 (Fed. Cir. 2007), is misplaced. Perhaps most importantly, *Brand* has no applicability to this appeal because Rambus has not provided evidence that the Board substituted its own expertise; Rambus only presumes this because the Board came to a different conclusion than the examiner. (Rambus's Br. at 53.)

To the extent the Board did rely on its scientific knowledge it did so to understand the meaning of prior art as it is required to do by law. *In re Berg*, 320 F.3d at 1315 ("examiners and administrative patent judges on the Board are responsible for making findings, *informed by their scientific knowledge*, as to the meaning of prior art references to persons of ordinary skill in the art and the motivation those references would provide to such persons."). Indeed, "administrative patent judges shall be persons of competent legal knowledge and scientific ability." 35 U.S.C. § 6(a). Accordingly, the Board may – as it has done here – rely on its scientific ability to analyze the meaning of prior art references.

Rambus also cites *In re Zurko*, 258 F.3d 1379, 1385-86 (Fed. Cir. 2001), to support its argument that the Board cannot simply rely on common sense or its own expertise without pointing to support from the record. (Rambus's Br. at 42-43.) Rambus fails to explain how *Zurko* is applicable to this case. Here, the Board did not simply rely on "common sense" as Rambus so contends, but explicitly pointed to undisputed factual findings based on the prior art that support the

rationale for obviousness. (*See, e.g.,* A32 ("the [examiner's] findings support obviousness").)

### D. The Board's Factual Findings Underlying Its Obviousness Determination Are Supported by Substantial Evidence

#### 1. An Operation Code Containing Both a Write Instruction and an Automatic Precharge Instruction

Rambus argues that "the Board did not make any findings of fact or point to any evidence showing that any of the cited prior art references includes a *single* operation code containing both a write instruction and an automatic precharge instruction." (Rambus's Br. at 48.) Rambus appears to be arguing that the "operation code" limitation of claim 34 must be taught in a *single* reference in order for a proper determination of obviousness to be made. However, Rambus's standard for a determination of obviousness is incorrect. Nonobviousness cannot be established by attacking the references individually when the rejection is predicated upon a combination of prior art disclosures. *In re Merck*, 800 F.2d at 1097.

In fact, the reasons to modify or combine the prior art do not have to be expressly disclosed in the prior art at all, let alone in a *single* reference. The Supreme Court in *KSR* stated, "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art

40

would employ." *KSR*, 550 U.S. at 418. Thus, the prior art references do not need to expressly teach an operation code containing both a write instruction and an automatic precharge instruction as urged by Rambus. Instead, given the prior art before it, the Board need only determine that it would have been obvious to a person having ordinary skill in the art to include both instructions in a single operation code and provide "some articulated reasoning with some rational underpinning" supporting its determination of obviousness. *Id.* (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

Rambus disagrees with the Board's determination that it would have been obvious to combine write and precharge instructions into a single operation code, and Rambus argues that this determination was not based on substantial evidence from the record. (Rambus's Br. at 48-49.) To the contrary, the Board relied on the following factual findings supported by the prior art:

- "Bennett discloses controlling memory devices using operation codes." (A30 (citing A1511).)

- "Bennett discloses multiple functions in a memory write code (*See* Bennett Fig. 34 (read-modify-write code signifying multiple functions).)." (A27[¶B4].)

- "Wicklund discloses that a memory controller should decide whether or not to automatically precharge an associated memory chip after a current access in order to improve the speed of memory operation." (A30 (citing A1511).)

- "[P]rior art systems typically precharge DRAMs in the non-page (normal) mode after a read or write operation" so that a quick subsequent access could occur. (A30 (citing ¶¶D, F1, F2, W2-W4).) In light of the

41

prior art teachings, the Board determined that "the precharge and write functions (and their signals) are intimately coupled together in prior art systems." (A30.)

▪ "[I]t also would have been obvious to send a precharge signal with a write signal in an op code, before writing to the currently open DRAM row in a page mode, but after determining, pursuant to a clock, that the page mode time is about to expire, as Wicklund…and Bowater…suggest." (A31 (citing ¶¶W2-W4; A1462(7:55-8:9).) In other words, it would have been obvious to include the precharge instruction with the write operation code "to ensure that a DRAM row in page mode is not kept open too long." (A31.)

▪ "[I]f the row does not match in a current page mode, Wicklund teaches *switching to the non-page (normal) mode* which closes the row, writes data to the newly requested row, *and automatically precharges, suggesting another reason for sending a precharge signal with the write signal to the DRAM* (i.e., so precharge can occur after writing as normally occurs in non-page mode)." (A32.)

Based on the above substantial evidence, the Board correctly determined that "[p]utting Wicklund's coupled precharge and write DRAM control signals into Bennett's synchronous multiple function write control op code amounts to no 'more than the predictable use of prior art elements according to their established functions.'" (A31 (citing *KSR*, 550 U.S. at 417).)

Additionally, the Board explained the examiner's error in determining non-obviousness. In particular, the Board determined that "the Examiner erred by failing to maintain the rejection of claim 34 based on the conclusion it would not have been obvious to employ a well-known precharge signal in a write op code signal, *when such a precharge normally followed a write in the prior art systems*." (A33; *see also* A32-33.) Moreover, as the examiner's factual findings reflect (*see*

Rambus's Br. at 44-47), the examiner committed the same error of attacking the references individually that Rambus now asserts, while the Board reviewed the combination of the references as a whole.

Rambus further contends that its expert, Mr. Murphy, provided evidence that it would have been "impractical and illogical" to include a precharge instruction and a write instruction in one operation code in the system of Bennett. (Rambus's Br. at 54.) Rambus reasons that the "precharging instructions, if they existed, would have come from within the large memory" while write requests would have come from an external source. (Rambus's Br. at 55 (citing Murphy declaration, A1629[¶105]).)

Yet, Rambus never relied on this paragraph (¶105) during its appeal to the Board. Thus, the argument that precharging instructions would have come from within the large memory is a new argument and cannot be raised for the first time before this Court. *See In re Watts*, 354 F.3d at 1367-68. Therefore, Rambus's new argument and alleged support should be not be considered by this Court.

Nevertheless, to the extent it was properly raised during the reexamination proceeding, Mr. Murphy's statement is premised on a factually inaccurate theory that the Versatile Bus Interface is on a separate chip than the User memory. (A1629[¶105] (referring to the Versatile Bus Interface as "a separate interface"). This argument was thoroughly addressed in the reexamination proceeding with the

Board finding that Bennett disclosed that the versatile bus interface and User memory were on the same chip. (A26-27[¶B1]; A1305(12:28-32).) Mr. Murphy also asserts that the signals between the Versatile Bus Interface and the User memory would be asynchronous, but this is also contradicted by Bennett's express disclosure. (A1350(101:50-54).)

Finally, Mr. Murphy's belief that a CPU would not handle DRAM-specific instructions contradicts the prior art of record, which makes clear that CPUs can and do send DRAM-specific instructions to memory devices. (*See e.g.*, A1444(4:61-62) ("in some computers, [DRAM] refresh is directly controlled by the CPU system.").) In addition, Bennett provides an example embodiment of a simple interconnect where the only two devices connected to the Versatile Bus are a processor and a single slave memory device. (A1307(15:42-53) and A1328(57:54-59).) In this simple two-device configuration the processor must be aware of memory specific attributes, such as page boundaries, since there can be no separate memory controller device as Rambus contends.

In other words, Rambus has not provided any evidence supporting its conclusory argument that Bennett's processor would not be able to control DRAM. Even if Rambus could provide evidence – which it cannot – the Board determined that Bennett's processor would not have been required to be aware of all memory attributes, such as page boundaries, to send a precharge instruction after a write in

non-page/normal mode. (A12 ("A requestor issuing a simple instruction involving a normal read and precharge *would not have been required to be aware of such page boundaries* which might occur in a page mode but do occur in the normal mode.").)

As demonstrated above, the undisputed factual findings from the prior art disclosures themselves were the basis for the Board's determination of obviousness. Undeniably, the prior art disclosures constitute "substantial evidence," or "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co.*, 305 U.S. at 229. Thus, Rambus's argument that the Board did not base its Decision on substantial evidence is incorrect in light of the very specific factual findings the Board relied on to support its Decision.

### 2. Automatic Precharge

Wicklund's invention used a prediction algorithm directed towards switching between two modes of operation: one that does not automatically precharge and instead leaves data available for a subsequent access (page mode), and one that does automatically precharge and does not leave data available for a subsequent access (normal/non-page mode). (A29[¶W3]; A1443(2:55-61).)

With regards to normal mode, as acknowledged by the '037 Patent and Rambus's expert, an automatic precharge occurs in normal/non-page mode in

conventional DRAMs. (A30 citing A83(10:25-31); *see also* A1743; and A10334.) Thus, when the system predicts using normal/non-page mode for the next access, a signal for an *automatic* precharge will occur after the current access. (A33.)

With regards to page mode, the Board found Wicklund teaches that "if a DRAM is in page mode for too long, as determined by a counter, it must be closed and refreshed (i.e., precharged)." (A31 (citing A28[¶¶W2-3]).) Bowater also teaches that a row must not be left open too long before it becomes corrupted. (A1462(7:54-8:8); A1748.) To address this issue, Bowater teaches setting a counter to automatically precharge after a completed memory access to prevent corrupted memory. (A1462(7:62-65); A1457.) Thus, the Board determined, based on substantial evidence from the prior art, that it would have been obvious to provide an instruction with an operation code to *automatically* precharge while in page mode to prevent data from being corrupted. (A31.)

Rambus's assertion that Wicklund waits until the next access address is received by the memory controller before determining to precharge is not reconcilable with Wicklund's "prediction" algorithm. (A1444(4:4-21).) The precharge instruction could only be based on "a prediction" if the precharge instruction was sent before the address for the next access is known.

With respect to Bowater, Rambus argues that "the Board failed to rebut" the examiner's finding that Bowater teaches away from an automatic precharge

because, in the examiner's opinion, it would "defeat the purpose of [Bowater's counter]" which is set to precharge the sense amplifiers after a given time period. (Rambus's Br. at 50-51.) However, the Board is not required to rebut the examiner's findings because the Board reviews *de novo* the examiner's determinations.

Nevertheless, the Board specifically considered Bowater's counter: "employing Bowater's (or Wicklund's) counter in Bennett to indicate when to send a precharge signal with Bennett's write op code would have been obvious, in order to ensure that a DRAM row in page mode is not kept open too long." (A31.) The fact that the Examiner came to a different conclusion than the Board on the same evidence is not legally relevant. *In re Jolley*, 308 F.3d at 1320.

For these reasons, Rambus has failed to show that the Board committed reversible error in determining that it would have been obvious to send an automatic precharge instruction with a write operation code.

### 3.  Synchronous Dynamic Random Access Memory Device

Although Rambus argues that claim 34 requires a DRAM chip, the terms for "synchronous," "dynamic," "random," and "access" alone or in combination simply modify the term "memory device," which has already been construed by this Court. *In re Rambus*, 694 F.3d at 47 ("we construe a 'memory device' as a component of a memory subsystem, not limited to a single chip, where the device

may have a controller that, at least, provides the logic necessary to receive and output specific data, but does not perform the control function of a CPU or bus controller.")

Rambus argues that the Board's determination that synchronous DRAMs would have been obvious is unsupported by substantial evidence because none of the prior art references discloses synchronous DRAMs. (Rambus's Br. at 56-57.) Again, Rambus is merely attempting to attack the references individually, rather than addressing what the combination of the references as a whole would have taught one of ordinary skill in the art. *In re Merck*, 800 F.2d at 1097. Indeed, the Board has recognized this repeated flaw in Rambus's argument: "Rambus's argument improperly focuses on what Bennett does not disclose *instead of the combined teachings*. The Decision finds that 'Bennett discloses synchronous memory chips' and that employing a notoriously well-known DRAM memory chip in place of Bennett's generic memory chip would have been obvious." (A3 (citing A29).)

The Board based its determination on the undisputed disclosures of the prior art of record, namely:

- "Bennett discloses synchronous memory chips." (A29 (citing ¶¶B1-B2).)
- "DRAMs were a well-known, if not dominant, form of memory chip device at the time of the invention." (A29 (citing ¶W1).)

Other evidence in the record also supported the Board's determination regarding DRAMs. (A10349 (The Intel 4002 is a "RAM" controlled by two external clock signals φ1 and φ2 (*i.e.*, synchronous) and included "[i]nternal refresh circuitry [that] maintains data levels in the cells" (*i.e.*, dynamic).) On this point the Examiner agreed with the Board, finding that it would have been obvious to "implement the synchronous memory of Bennett using DRAM based memory technology, which was the dominant main memory technology during the relevant time frame." (A10473.) Accordingly, both the examiner and the Board correctly determined that a synchronous DRAM would have been obvious in light of the prior art disclosures. Rambus cannot provide any evidence that the Board erred in this determination of obviousness or point to any evidence that would reasonably lead this Court to a different conclusion.

Notwithstanding the overwhelming evidence of record that a synchronous DRAM would have been obvious, Rambus continues to argue the merits of this determination to this Court. Specifically, Rambus argues that "Bennett's Versatile Bus…was not designed to directly interface with a *single* DRAM chip." (Rambus's Br. at 57.)

Bennett's Versatile Bus is purposefully designed to be a flexible standard interface that provides interconnection to a myriad of devices. (A1305(12:14-25).) In fact, the system of Bennett is fully aware that certain User devices like memory

will be "crude[]," while other User devices like CPUs will be "sophisticated," but that both are designed to connect to the same Versatile Bus. (A1319(40:55-59).) Thus, unlike a superhighway that is not designed to be connected to a residential driveway, the Versatile Bus in Bennett is designed to be connected to User memory. In fact Bennett even provides an example where the only two devices connected to the Versatile Bus are a processor and a single User memory chip. (A1307(5:42-53); A1328(57:54-59).) Thus, Rambus's "single DRAM chip" argument contradicts Bennett's disclosure.

Further, the Board based its determination on the finding that Bennett discloses *a user device* that is connected to Bennett's Versatile Bus: "Bennett discloses Versatile Bus Interfaces as VLSIC (very large scale integrated circuit) user devices and interfaces 'upon the same chip substrate'…with such a user device including memory." (A26[¶B1].) In other words, both a Versatile Bus Interface and memory (for example, DRAM) are included on the same single chip that is connected to Bennett's Versatile Bus.

Next, Rambus argues that the only memory disclosed in Bennett is "large memory" which "would have contained *many* DRAM chips connected together on a separate, secondary bus and operated asynchronously." (Rambus's Br. at 57.) This argument is meritless for at least two reasons.

First, Rambus's argument relies on a new claim construction of "synchronous dynamic random access memory device" that limits the term to just the memory itself while excluding other elements on the same chip as the memory, such as Bennett's Versatile Bus Interface Logics. Rambus has identified nothing in the '037 Patent that would require the memory itself to receive a synchronous signal so long as the chip containing the memory device receives a synchronous signal.

Rambus's argument to exclude the Versatile Bus Interface Logics is inconsistent with the Court's construction that a memory device may contain some control and interface circuitry. *In re Rambus*, 694 F.3d at 47. Therefore, Bennett teaches this limitation since it is undisputed that the single chip containing the Versatile Bus Interface and the memory in Bennett received a synchronous signal. (A26-27[¶¶B1-B2]; Rambus's Br. at 34 ("Bennett discloses many possible Users that can be connected to the synchronous Versatile Bus …").)

Second, even assuming Rambus's new claim construction was correct, Bennett would still teach the limitation because Bennett explicitly discloses that the communication between the Versatile Bus Interface Logics and the User memory is synchronous. (A1350(101:50-54) ("The timing diagram of Fig. 52a firstly shows as reference the signals (H) φ1 and (H) φ2 *to which all communication between the Versatile Bus Interface Logics and the User, and upon*

*the Versatile Bus, is synchronously referenced*.").) Thus, the User memory itself receives synchronous signals.

Therefore, Bennett teaches a "synchronous dynamic random access memory device," regardless of whether the claim requires the single chip containing the DRAM and Versatile Bus Interface to receive synchronous signals or whether the claim requires the User memory itself to receive synchronous signals.

### 4. Delay Time

Finally, Rambus argues that the Board failed to cite any evidence showing the claimed "delay time." (Rambus's Br. at 60-61.) However, the Board found that Rambus only presented truncated arguments on this limitation and so considered only the truncated issue raised by Rambus. (A33 (citing *In re Lovin*, 652 F.3d 1349, 1353 (Fed. Cir. 2011)).) Rambus's four sentence briefing before the Board on this issue is reproduced in whole below:

> Claim 34 recites that the synchronous dynamic random access memory device sample the data, in response to the operation code, after a delay time transpires. Micron points to Figure 36 of Bennett to show support for these features. (Micron Br. at 7.) *Figure 36 is directed to Bennett's large memory, which as described above would be understood as a combination of the VBI and multiple memory devices.* Thus, Micron has not shown that the actual memory devices in Bennett sample the data, in response to the operation code, after a delay time transpires, as required by claim 34. (A1590.)

Thus, the only issue that Rambus even arguably raised before the Board is whether Bennett's VBI and memory are on a single chip or multiple chips. The

Board explicitly addressed that issue in detail in its decision, finding that Bennett's VBI and memory are part of a single chip. (A4-6; A26[¶B1].) As previously discussed, Rambus cannot reasonably dispute that finding since Bennett is explicit that both the Versatile Bus Interface Logics and the memory can be on a single chip. (A1324(50:7-17); A1317(36:19-25).)

The Board determined that Micron's arguments were persuasive and supported the obviousness of claim 34 including the delay time. (A7; A12.) Therefore, the Board fully addressed the only argument Rambus raised relative to the delay limitation of claim 34.

### E. Alternatively, the Board Erred in Not Adopting the Rejections Based on JEDEC and Park

Alternatively, in addition to the Bennett rejections discussed above, JEDEC anticipates claim 34, and Park in view of JEDEC renders claim 34 obvious. The Board and the examiner erred in determining that claim 34 of the '037 Patent is entitled to the earlier filing date of the '898 parent application, which was the only basis for not adopting Micron's proposed rejections based on JEDEC and Park. As Micron argued on appeal to the Board, claim 34 is not entitled to an earlier filing date because claim 34 is so different from the "invention" described in the specification of the original '898 application that the right of priority to those earlier applications was lost. (A1749-1763.)

Claim 34 is not limited to the type of "bus" over which the memory device communicates with the rest of the system. The '898 parent application, to which the '037 Patent purports to claim priority, is explicit that the bus must be a "multiplexed" bus, where the various address, data, and control information is carried over the same plurality of bus lines, and is "multiplexed" so that the different information is carried at different times. Accordingly, Micron showed that because Claim 34 broadly encompasses any "bus" that would connect the memory to the rest of the system, that claim has no written description support in—and no priority to—the '898 parent application, which describes only a "multiplexed" bus.

In rejecting Micron's arguments, the Board based its decision on its belief that the priority determination was controlled by the claim construction adopted by this Court in *Infineon*, F.3d at 1094-95. (A36-38.) That belief is incorrect. In a post-*Infineon* case involving priority issues as raised in this appeal, this Court stated "*Though it would certainly be reasonable to conclude that Rambus's claims do not meet the written description requirement on the basis of ICU Med., that argument was presented to the jury and rejected by it.*" *Hynix*, 645 F.3d at 1352-53 (Fed. Cir. 2011) (referring to *ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, 558 F.3d 1368 (Fed. Cir. 2009)).

The Court's statements in *Hynix* show that the *Infineon* claim construction ruling is not dispositive of the written description priority issue. As in *Hynix*, and as further detailed below, "it would certainly be reasonable to conclude that Rambus's claims do not meet the written description requirement on the basis of *ICU Med*." *Hynix,* 645 F.3d at 1352-53. Moreover, unlike in *Hynix*, there is no jury verdict that constrains this Court's determination of the priority issue.

As shown below, the evidence demonstrates that claim 34 of the '037 Patent is not entitled to the filing date of the '898 application. Thus, JEDEC and Park are prior art and should have been applied by the Board to reject claim 34.

### 1. The Board Relied on an Improper Legal Standard for Priority Written Description

The Board upheld the Examiner's determination of priority based on this Court's decision in *Infineon* that the claim construction of "bus" was not limited to a multiplexed bus. (A36-38.) Although Micron argued that *Infineon* did not apply to the section 120/112 issue in this proceeding, the Board improperly concluded:

> Micron's contentions are unconvincing to show that *Infineon* was wrongly decided or would somehow require reaching a different result based on a written description priority analysis as opposed to its claim construction analysis. (A36.)

Nevertheless, the Board is incorrect that an analysis of written description priority would have the same result as this Court's claim construction analysis in *Infineon*. This Court recognizes that a patentee may prevail on a broad claim

55

construction, only to have the patent later declared invalid for failure to include a written description of sufficient breadth. *See, e.g., Ariad Pharms., Inc. v. Eli Lilly & Co.*, 560 F.3d 1366, 1377 (Fed. Cir. 2009). Notably, in deciding *Hynix* this Court cited *Infineon* only with respect to claim construction and not regarding written description. *Hynix,* 645 F.3d at 1349-53. Thus, even if *Infineon's* claim construction is correct that "bus" is not limited to a "multiplexed bus," that fact alone does not mean the specification of the '898 application provides written description support for a non-multiplexed bus as determined by the Board.

### 2. The Proper Legal Standard for Determining Priority Written Description

In order for a patent claim to receive the benefit of an earlier filing date under 35 U.S.C. § 120, the invention as claimed must have been "disclosed in the manner provided by the first paragraph of section 112 of this title [in the earlier application]." 35 U.S.C. § 120; *see also Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 1158 (Fed. Cir. 1998). Courts have found three requirements encompassed by the language of 35 U.S.C. § 112, ¶ 1: "[1] describe, [2] enable, and [3] set forth the best mode." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002); *Ariad.*, 598 F.3d at 1344-1345 (Fed. Cir. 2010) (*en banc*).

The issue here is whether the "invention" recited in claim 34 was described in the manner required by § 112 in the original '898 application in order to provide the right to an earlier filing date under 35 U.S.C. § 120.

In *ICU Medical*, the Federal Circuit addressed a claim that failed to recite an element of the invention described in the specification. The patent at issue in *ICU Medical* was directed to a medical valve. *ICU Med.*, 558 F.3d at 1377. All of the valves described in the patent specification included a "spike"; however, the relevant claims did not require a spike. *Id.* The Court referred to the "claims as spikeless not because they exclude the preferred embodiment of a valve with a spike but rather because these claims *do not include a spike limitation*." *Id.* The patentee argued that claims were "neutral regarding whether the valve must include a spike," and therefore, covered either the presence or absence of a spike. *Id.* The Court found that the patentee violated the written description requirement by attempting to broaden the claims to exclude an element of the disclosed invention:

> [The] asserted spikeless claims are broader than its asserted spike claims because they do not include a spike limitation; these spikeless claims thus refer to medical valves generically—covering those valves that operate with a spike and those that operate without a spike. *But the specification describes only medical valves with spikes. Id*. at 1378.

Similarly, in *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336 (Fed. Cir. 2005), the Court was faced with two similar independent claims (claims 1 and 21). *Id.* Claims 1 and 21 were both directed to image processing on a computer using a discrete wavelet transformation (DWT) based compression process. *Id.* at 1340. Nevertheless, while claim 1 recited the specific way to calculate the DWT that was described in the specification, claim 21 recited the

process generically. The Court affirmed the invalidity of claim 21 based on a violation of the written description requirement because claim 21 as drafted was broader than the specification could support. *Id.*

A key factor discussed by the Court in holding claim 21 invalid was that the broad generic claim 21 covered "prior art that suffers from precisely the same problems that the specification focuses on solving." *Id.* at 1343-44. In other words, by describing how the disclosed invention differs from the prior art, a specification defines both what the disclosed invention is, and importantly, what it is not.

### 3. The Memory Device "Invention" Disclosed in the '037 Patent Requires an Interface to a Narrow Multiplexed Bus

In resolving the issue of whether claim 34 of the '037 Patent is entitled to claim priority to the '898 application, the first step is to determine what memory device "invention" is described in the '898 application. *Tronzo*, 156 F.3d at 1159.

As the following analysis shows, the "invention" of the '898 application required a bus interface that includes signal lines over which substantially all address, data, and control information is carried. Because the address, data, and control information is carried over the same lines, the information must be "multiplexed," or "time shared," in that each of the different types of information (address/data/control) is sent over the common set of bus lines at different times. (*See* A1940; A2027.) The '898 application describes in detail this "multiplexed bus" invention.

First, the "Summary of the Invention" explains that the "present invention" requires the disclosed narrow multiplexed bus:

> The *present invention* includes a memory subsystem comprising at least two semiconductor devices, including at least one memory device, *connected in parallel to a bus, where the bus includes a plurality of bus lines for carrying substantially all address, data and control information needed by said memory devices*, where the control information includes device-select information and *the bus has substantially fewer bus lines than the number of bits in a single address, and the bus carries device-select information without the need for separate device select lines connected directly to individual devices*.

(A1905.) Indeed, the very next paragraph describes how the prior art must be "modified" in accordance with the invention to include an interface to the "new bus" (A1905-06); (A1906 ("New bus interface circuits *must be added* and the internals of prior art DRAM devices *need to be modified* so they can provide and accept data to and from the bus at the peak data rate of the bus.").) The '898 application also explains how the multiplexed bus interface is required for DRAM and other devices in "the system of this invention." (*Id.*)

Thus, the new bus interface uses the same bus lines to carry address, control *and* data information. Moreover, the patent excludes the possibility of signal pins (connections to signal lines) other than to the address/control/data bus lines. The Detailed Description also consistently describes the "present invention" as requiring devices adapted to interface to this narrow multiplexed bus. (A1909.)

Although the '898 application describes certain embodiments of the multiplexed bus interface as "preferred" or "examples" (*see*, *e.g.*, A1907 (providing specific stub capacitances and inductances); A1910 (using 40 bit addresses)), the '898 application *never* describes the narrow multiplexed bus interface itself as merely preferred or exemplary. Nor does the '898 application describe any alternative bus interface structure.

All the original claims of the '898 application that are directed to sending or receiving data are limited to devices adapted to interface to the narrow multiplexed bus by reciting a "bus including a plurality of bus lines for carrying substantially all address, data and control information needed by said memory device." (*See*, *e.g.*, A1961 (claim 1); *see also* A1963-2016 (claims 13, 25, 46, 56, 68, 82, 95, 97, 103, 106, 108, 111, 114, 116, 118, 121, 124, and 135).)

Indeed, only two original independent claims did not expressly describe interfacing to the multiplexed bus: claim 73, which is directed to the specific early/late clocking scheme disclosed in the '898 application, and claim 91, which is directed to the specific packaging scheme disclosed in the '898 application. That these claims do not recite the multiplexed bus is irrelevant, however, because neither claim is directed to sending or receiving data to or from a memory device. The '898 application described the specific early/late clock and specific packaging scheme described in the specification as separate inventions. (*See* A1903 ("The

clocking scheme used in this invention has not been used before"); A1904 ("Another object of this invention is to provide a clocking scheme to permit high speed clock signals to be sent along the bus with minimal clock skew between devices."); A1940 ("Low Power 3-D Packaging" and "an innovative 3-D packaging technology").)

### 4. The "Prior Art" to the '037 Patent Was Distinguished Based on the Bus and Interface Structure

In addition to the above passages describing the "invention" disclosed in the '898 application, a second important source of information comprises the '898 application's description of what the disclosed invention *is not*. *LizardTech*, 424 F.3d at 1343-44. In the Background of the Invention, the applicants distinguished the disclosed bus from the prior art by asserting that the new bus can transmit all address, data, and control information over the same bus lines whereas the prior art relied on separate bus lines. (A1899.)

The '898 application also includes a "Comparison With Prior Art" section, in which purported differences between the disclosed invention and various prior art references are discussed. All but one reference is distinguished on the basis that they do not disclose a bus that handles all the signals, i.e., a multiplexed bus. (A1901 to 1904; (*e.g.*, in distinguishing U.S. Patent No. 3,821,715 to Hoff *et al.*, the application states, "*most important, not all of the interface signals between the*

*devices are bused* (the ROM and RAM control lines and the RAM select lines are point-to-point)").)

The only prior art reference for which a bus structure was not discussed is U.S. Patent No. 4,247,817 to Heller, in which the clocking scheme of the '898 application, rather than the transfer of address/data/control information, was described. (A1903.) As discussed above, the clocking scheme was described as a separate inventive concept from the interface to the new multiplexed address/data/control bus. (*See* A1903-04.)

In fact the applicants conceded that disclosed features of the '898 application had been used in the prior art, "but never in conjunction with *the bus architecture of this invention*." (A1957.) These consistent descriptions of the prior art and how the "invention" differed from the prior art demonstrate that the invention described in the '898 application for reading and writing data required an interface to a narrow multiplexed bus.

Because claim 34 does not limit the way in which the recited memory device communicates with the rest of the system and is not limited to the "multiplexed bus" as described in the '898 patent, claim 34 does not have written description support in the '898 application. As a result, Rambus cannot claim priority to the '898 application, JEDEC and Park are prior art, and the Board erred in not applying those references against claim 34.

## VI.    **CONCLUSION**

The Board's decision that claim 34 of the '037 Patent is rendered obvious by Bennett in view of Wicklund or Bowater should be affirmed. As demonstrated above, substantial evidence supports the Board's factual findings, and the Board's obviousness conclusions are correct as a matter of law.

Alternatively, Micron respectfully requests that this Court reverse the Board's determination that claim 34 of the '037 Patent is entitled to the benefit of the earlier filing date and remand to the Board for consideration of JEDEC and Park as prior art.

Dated: June 14, 2013                    Respectfully submitted;

/s/Henry A. Petri, Jr.

Henry A. Petri, Jr.
James P. Murphy
Michael W. O'Neill
Margaux A. Aviguetero
Daniel P. Mullarkey
NOVAK DRUCE CONNOLLY BOVE +
QUIGG LLP
1875 Eye Street, NW
Eleventh Floor
Washington, DC 20006
(202) 331-7111

*Attorneys for Appellee*

.

# United States Court of Appeals
## for the Federal Circuit

### CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by NOVAK DRUCE CONNOLLY BOVE + QUIGG LLP, Attorneys for Appellee to print this document. I am an employee of Counsel Press.

On, June 14, 2013, Counsel for Appellee has authorized me to electronically file the foregoing **Brief of Appellee** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> J. Michael Jakes
> James R. Barney
> Naveen Modi
> Molly R. Silfen
> Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
> 901 New York Avenue, N.W.
> Washington, DC 20001
> 202-408-4000
> mike.jakes@finnegan.com
> james.barney@finnegan.com
> naveen.modi@finnegan.com
> molly.silfen@finnegan.com

Additionally, two paper copies will also be serviced by mailed to the above counsel via Priority Mail when the paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will

filed with the Court, via Federal Express, within the time provided in the Court's

rules.

June 14, 2013                                    /s/ John C. Kruesi, Jr.
                                                 John C. Kruesi, Jr.
                                                 Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  <u>x</u>    The brief contains 13,966 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

  <u>  </u>    The brief uses a monospaced typeface and contains lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  <u>x</u>    The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2007 </u>in a <u>14</u> point <u>Times New Roman</u> font or

  <u>  </u>    The brief has been prepared in a monospaced typeface using <u>MS Word 2002 </u>in a ___ characters per inch_____ font.

Date  June 14, 2013               <u>/s/Henry A. Petri, Jr.     </u>
                                           Henry A. Petri, Jr.
                                           Counsel for Appellee